UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X     Docket No._____

DIANE MADDEN,

Plaintiffs,

-against-                                         **COMPLAINT**

THE TOWN OF HEMPSTEAD, and
ANTHONY SANTINO, KATE MURRAY
MICHAEL PASTORE, GERRY MARINO,
KEVIN DENNING, and GARETT GORTON

Defendants.
------------------------------------------------------------X

Plaintiff DIANE MADDEN, by and through her undersigned attorneys, complaining of

the Defendants herein, alleges upon knowledge as to themselves and her own actions, and upon

information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     The more things change the more they stay the same. After resolving a contentious

lawsuit against the Town of Hempstead (hereinafter "the Town") in which the Town

admitted guilt, Madden, was hopeful that any animus between she and the Defendants

was finally resolved. Sadly, after a brief period where things seemed to be improving, it

became clear that the Defendants were only interested in re-gaining political power,

control and once again, misusing taxpayer dollars, misleading the public and putting the

care and safety of our animals at risk. Following the hiring of Pastore as Director of the

Town of Hempstead Animal Shelter (hereinafter the "Shelter") by Murray, the situation

started to deteriorate. Defendants engaged in a blatant pattern of retaliation and

intimidation against Plaintiffs and anyone else who Pastore perceived to be friendly

1

towards Plaintiffs. Upon information and belief, Pastore threatened, manipulated and caused emotionally disturbing situations, damage to the Plaintiff's reputation and standing in the community even going as far as euthanizing helpless animals to instill fear and compliance with the Defendants' agenda. Plaintiff was led to believe and assured by incoming Town Supervisor Anthony Santino conditions would improve, but instead, Pastore's behavior only worsened. Santino gave Pastore free reign to terrorize anyone who did not conform with their plan of turning the Shelter back to the "ole pound" mentality and bastion of political cronyism that it used to be. Plaintiffs and anyone sympathetic with them were deemed the enemy and the Defendants exhibited no restraint in achieving their goals.

2. Plaintiff Madden brings the instant suit for violations of her First Amendment Rights to Freedom of Speech and Access to the Government, and their right to equal protection under the laws, pursuant to 42 U.S.C. § 1983. She seeks declaratory, equitable, injunctive and compensatory relief, as well as punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343, and supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this case pursuant to 28 U.S.C. § 1391.

## PARTIES

2

5.   Plaintiff DIANE MADDEN (hereinafter "Madden") is an adult individual who resides in East Meadow, New York. For at least the last fourteen years, Madden has served the community as a spokesperson and source of information about animal rights and flaws in animal shelters on Long Island. Madden has also founded various animal protection groups within the Town of Hempstead.

6.   Defendant TOWN OF HEMPSTEAD (hereinafter "the Town") is a municipal corporation organized and existing under the laws of the State of New York with its principal place of business located at One Washington Street, Hempstead, New York. Pursuant to the New York State Agricultural & Markets Law, the Town operates, staffs and supervises the employees of the Town of Hempstead Animal Shelter ("the Shelter") located at 3320 Beltagh Avenue, Wantagh, New York.

7.   Defendant ANTHONY SANTINO (hereinafter "Santino") is, and has been, the supervisor of the Town since January 2016. As such he is currently the highest elected official in the Town.

8.   Defendant KATE MURRAY (hereinafter "Murray") was the supervisor of the Town at all relevant times up until January of 2016.

9.   Defendant MICHAEL PASTORE (hereinafter "Pastore"), at all relevant times, was and is an employee of the Town assigned to work in the Shelter. Upon information and belief, Pastore is a resident and domiciliary of the Town of Hempstead and State of New York.

10.  Defendant KEVIN DENNING (hereinafter "Denning"), at all relevant times, was and is an employee of the Town assigned to work as the Shelter liason. Upon information and belief, Denning is a resident and domiciliary of the Town of Hempstead and State of New York.

3

11. Defendant GERRY MARINO (hereinafter "Marino"), at all relevant times, was and is an employee of the Town assigned to work as the Commissioner of General Services. Upon information and belief, Marino is a resident and domiciliary of the Town of Hempstead and State of New York.

12. Defendant GARRETT GORTON, (hereinafter "Gorton") at all relevant times, was an employee of the Town assigned to work in the Shelter. Upon information and belief, Gorton is a resident and domiciliary of the Town of Hempstead and State of New York.

## *FACTS*

13. On December 8, 2010, Madden, along with others, filed a lawsuit against the Town and various individual defendants including Murray. That lawsuit was premised upon claims of First Amendment Retaliation as well as violations of Plaintiff's Civil Rights, among other issues. On January 7, 2013, the matter was resolved by an Offer of Judgment. Shortly after the resolution of this matter, Murray announced a plan to make certain changes that would be implemented at the Shelter to move the shelter away from a "kill shelter" and towards becoming a progressive adoptive center. Under the scrutiny of a New York State Fiscal and Operational Audit of the Shelter, these changes included, for the first time in the history of the Shelter the hiring of new personnel who had the proper experience, training and skill in animal care and sheltering, and shared the no-kill mentality and brought forward the movement of transparency and accountability by implementing proper record keeping and policies and procedures that would assure the public of life saving programs for the Shelter animals. In other words, , the Shelter would be transformed from a bastion of corruption, deceit and fiscal waste in which the animals

4

paid the ultimate price towards the progressive and humane "adoption center" mindset that everyone demanded. These goals were akin to those Madden and other likeminded individuals had fought to implement at the shelter for a long time.

14.    As part of these changes, the Town removed employees of the Shelter who were hired due to political reasons and began hiring highly qualified animal care personnel who in turn implemented the positive changes championed by Madden and delineated by Murray in her public initiative. All new staff supported and implemented new "no-kill" philosophies and pro adoption themes and sought to make the shelter a source of pride for the Town, as well as a safe haven for animals in need.

15.    The Shelter's new Director, Cindy Iacopella and the Assistant Director, Stacie DaBolt, sought to rectify the Shelter's former closed door mentality and as such encouraged Madden to engage in meaningful participation towards the Shelter's future. Positive changes were observed by Madden and she felt optimistic about the Shelter's new direction..

16.    Plaintiffs' optimism soon faded as the Town and Murray demonstrated that their alleged commitment to the Shelter and its animals was a temporary fix and Murray's very public promises and agendas were little more than a show to placate the public. Behind closed doors, the Town undertook a plan of action that belied Defendants' public façade of cooperation and goodwill. Upon information and belief, Murray was aware of this plan and was complicit in its' undertaking.

17.    In 2014, Cindy Iacopella resigned from the Shelter and was replaced by Pastore. Upon information and belief, Kate Murray knew of and approved Pastore's hiring and was Pastore's supervisor at the Town.

5

18.    Pastore was a transplant from the New York City Animal Care and Control shelter and
       possessed a mindset that was completely contrary to the progressive "adoption center"
       mentality that was supposed to be the cornerstone of the Town's new Shelter philosophy.
       Pastore stated "We are not an adoption center, we are an open admission government
       animal shelter," indicating that the Town was reverting to a "pound mentality," and
       killing animals was once again a viable, unapologetic option.

19.    Pastore referred to the Shelter's animals as "inventory," and the potential adopters as
       "civilians." He unabashedly mocked and provoked animal advocates such as Madden,
       and any person involved with the shelter who had similar views. Upon information and
       belief, Pastore referred to anyone who shared the vision and belief of Madden as
       "emotionally disturbed people" or "EDPs" and used this term during meetings with the
       Shelter employees and volunteers when describing Plaintiff Madden and people who
       shared her beliefs.

20.    Pastore also set to work on returning euthanasia to the Shelter en masse, despite the now
       hollow promise that the Shelter would be "adoption centered." Upon information and
       belief, paperwork was manipulated to fraudulently read that the animals were killed
       pursuant to "Owner Request Euthanasia," when the animals were being turned into the
       Shelter by the owners with the understanding that they would placed for adoption. Upon
       information and belief, this was done by Pastore to make it appear that far fewer animals
       were being killed under his control. Also upon information and belief, Pastore eliminated
       proper policies, procedures and protocols so that very little information was recorded or
       traceable thereby preventing the public from being able to obtain information about the
       animals under New York State law. Animals that once were turned in for adoption,

6

rehabilitation and rescue, were alternatively quickly snuffed out and killed without anyone ever knowing.

21. Prior to Madden's initial lawsuit, the Shelter had been a bastion of cronyism. The animals were left to languish, hostages of a corrupt political machine until Madden took a stand, and exposed the abuse and corruption through her original lawsuit. Upon information and belief, Pastore, a beneficiary of the crony regime, resented Madden's motivations and desperately sought to resurrect corrupt policies in concert with the other Defendants. Similarly, upon information and belief, Murray was resentful of Madden due to the outcome of the last lawsuit and the fact that she played a large role in convincing the New York State Comptroller's Office to conduct a first of its kind fiscal and operational audit of the Shelter and as such encouraged Pastore's behavior by disregarding all complaints she received regarding Pastore and assigning her aide Cheryl Petrie as the shelter liason with the express purpose of aiding and abetting Pastore.

22. As part of the Defendants' plans for retribution and to restore the Shelter to its original status as a haven for cronyism, Pastore harassed Laura Garber, the animal behaviorist hired as part of Murray's publicly touted animal shelter initiative. Pastore sought to replace her with Nick Derenze who upon information and belief not only lacked the proper credentials and experience to be an animal behaviorist but had been removed from this position previously due to a history of abusing animals. Mr. Derenze's potential promotion smacked of the very corruption that previously existed as upon information and belief Derenze was the boyfriend of Shelter rescue coordinator Emily Tanan, who fully supported and worked in lock step with Pastore's running of the Shelter. Ms. Tanan submitted a formal complaint about Ms. Garber to further the effort to push her to resign.

7

Pastore's attacks did not end there. Upon information and belief, Ms Garber's office dog "Rebel" was denied urgent rescue outreach and medical treatment he needed. Ultimately these medical issues caused Rebel's death. This was a clear sign to anyone who opposed Pastore, cross him and the animals would pay the price.

23. None of this behavior went unnoticed by the Plaintiff. However, all attempts to address Pastore's behavior were obstructed by Cheryl Petrie. She supported, defended and protected Pastore so that he could further advance the plan to abolish transparency, accountability, policies, procedures and any trace of the horrific treatment of the animals at the Shelter along with the people who got in their way. Upon information and belief, Pastore would in turn refer to Petrie's assistance as "referring to legal". Upon information and belief, Petrie's actions were pursuant to Murray's instruction and with her express knowledge.

24. These developments understandably traumatized Plaintiffs, who viewed these actions as a concerted attempt by the Town to renege on its very public promises to fix the Shelter. The Plaintiffs were even more upset by the fact that it was the animals, who Madden had dedicated her life to protect who were being callously used by the Defendants as ammunition to further their goals of political corruption.

25. At the recommendation of Murray, Madden and two other advocates (one of which was Madden's personal attorney) met with Pastore and Cheryl Petrie in an attempt to find common ground. However the meeting was anything but amicable as Pastore was openly hostile. Instead of trying to resolve the differences between the parties neutrally, throughout the meeting Petrie instead positioned herself as an ally of Pastore's. While at the meeting, Madden showed official Government documents to Petrie and Pastore that

8

were altered and changed to read that Stacie DaBolt authorized all of the animals killed at the Shelter while she was there. Cheryl Petrie was alarmed and immediately asked Pastore about his involvement with this which he completely dismissed and denied. Cheryl Petrie asked permission to take copies and assured Madden that she would investigate these issues. She later told Madden's personal attorney in an email that this is a very serious matter and one she will not take lightly and that the town will be investigating this. The Town later blamed these issues on an independent third party software company, who upon information and belief had neither the motive nor the resources to modify the records.

26. After this meeting, Pastore redoubled his efforts to intimidate anyone who opposed the "Plan" that he was tasked with undertaking. He began checking surveillance footage from the Shelter to determine which volunteers, members of the public and employees to target especially those who, in his opinion, were aligned with or had any dealings with Madden. When he found "proof" of an employee or volunteer talking to Madden, he would immediately engage in a pattern of harassment and intimidation against that individual until that person was removed, banned, demoted or forced to resign from the Shelter. Pastore also repeatedly made attempts to discourage Madden from coming to the Shelter. He also encouraged a selected group of employees and volunteers to antagonize and attack Madden while discarding the rules and policies of the volunteer code of conduct.

27. On or about January of 2016, Murray left office as Town Supervisor and was replaced by Santino. Santino met with Madden in February 2016 and initially seemed motivated to as

9

Santino said "reset the relationship." As a purported showing of good faith, Santino replaced Cheryl Pietri as the shelter liaison with Denning.

28. Santino's true colors were brought to light, however, when he refused to address the ongoing and increasingly outrageous behavior of Pastore. Upon learning about Pastore's actions, Santino would make vague promises to "look into things" but ultimately did nothing. Even though Santino was informed and aware of the actions of Pastore that were endangering animals and people, he allowed the behavior to continue. He allowed Denning to justify and make excuses for Pastore's actions.

29. Santino also agreed to implement certain changes Madden requested at the Shelter. In her initial meeting with Santino, Madden had given Santino, at his request, a list of qualified personnel at the Shelter. Pastore somehow obtained this list and placed each named individual in his crosshairs. Each staff member singled out by Madden as valuable became a target to Pastore and he undertook to harass and intimidate each one.

30. Furthermore, Denning's appointment did little to change the situation at the Shelter. At meetings with Madden, Santino would instruct Denning to act on certain suggestions made by Madden. Denning, however, would disregard these instructions and take no action. When questioned on this inaction, Santino would publicly show frustration with Denning's purported insubordination but would take no action against Denning. This demonstrated that Santino was complicit with Denning's behavior and as such encouraged it.

31. As part of his new regime, Santino hired Marino as the Commissioner of General Services for the Town. In this role, Marino was responsible for supervising Pastore as well as any employee status changes. Marino was present at most meetings between

10

Madden and Santino. He would be tasked to make changes at the shelter but he ultimately did nothing. Upon information and belief, instead of implementing the changes discussed by Madden and Santino, Marino would seek out people listed by Madden as qualified and replace them with unqualified but politically connected candidates.

32. When a colleague of Madden's asked the Town if Madden could accompanying her to view FOIL records relevant to the Shelter, the request was denied despite the fact other people were permitted to do so. At or around this time, Defendants also began targeting anyone who was perceived as a friend to Madden, going so far as to harass any person who was on Madden's Facebook friend list or who "liked" Madden's Facebook postings.

33. In light of the aforementioned, Santino announced that a full investigation would be launched into the disputes and complaints regarding the Shelter. While the Plaintiffs believed Santino was acting in good faith and investigating Pastore's increasingly disturbing behavior, it soon became evident that Madden was not only the target of this investigation, but that this investigation was being used to fool people into speaking confidentially so that the Defendants could gain more information and insight as to who they should get rid of. In turn the Defendants would use the information gleaned to attack the Employees along with other employees deemed by Pastore to be "loyal" to Madden.

34. In May of 2016, Madden entered the Shelter, as she usually did, to check the kennels open to the public and to make sure the animals were being cared for properly. Madden noticed a volunteer named Cynthia Xelas taking pictures of her for an unknown reason. Xelas then began to verbally harass Madden, making vulgar gestures towards Madden,

and acting in an aggressive manor. Shortly thereafter, an employee, Cynthia Gomez, approached Madden and baselessly accused Madden of taking pictures of her. Visibly upset by these unprovoked and unnecessarily hostile interactions, Madden approached a supervisor named Christine Giuliani and asked for the Shelter's Volunteer Code of Conduct as well as the surveillance footage of the incident. Pastore refused to allow Madden to see the Shelter's Volunteer Code of Conduct, despite the document being a public record and being attached to the volunteer application. Madden's personal attorney attempted to obtain copies of the surveillance footage but was repeatedly stalled by William Muller. Upon information and belief, Mr. Muller is an attorney on the Town's payroll who has presented himself in the past as "Mr. Santino's personal attorney". Madden filed a formal complaint with Town officials regarding the incident at the Shelter which, to date, has been completely ignored. When the footage was finally released to Madden's attorney, it was suspiciously edited to remove the video of the aforementioned interactions with Madden. Thereafter, another formal complaint was filed by Madden and again was ignored by the Town. Around the same time Xelas approached shelter employee Dolores Stormo and confessed to taking all of the actions delineated above.

35. A few weeks later, Madden returned to the Shelter to again check on the conditions. This time she was harassed by William Nussbaum, a volunteer, who mocked Madden and took photos of her. Madden was understandably shaken by these events and filed another formal complaint.

36. Upon information and belief, Cynthia Xelas, Cynthia Gomez and William Nussbaum were acting intentionally with Santino, Pastore, and Denning's encouragement and

12

permission. Upon information and belief, the three were never disciplined in any way for any of incidents discussed *supra* as the code of conduct dictates.

37.   On September 8, 2016, Santino announced a program asking for people to come read books to dogs at the Shelter. Around the same time, Madden issued a press release stating that Santino had reneged on a significant number of promises and that he had made numerous false promises regarding the Shelter. Upon information and belief, this angered Santino whose reading program was designed as a scheme to deflect public criticism about the Shelter.

38.   During this entire time period, the Town's investigation initiated by Santino was still ongoing but the true intent of the investigation was coming to light. Upon information and belief, not getting the results he was hoping for as well as finding no employees willing to handle the investigation, Santino retained Garrett Gorton under the auspices of acting as an investigator, despite there already being an investigator assigned to the matter. In reality Gorton was an enforcer for the Town, seeking to advance Defendants' agenda. Gorton claimed to be independent, but upon information and belief, Gorton was and continues to be paid by Town for his work.

39.   Gorton contacted Madden under the auspices of gathering information for the Shelter investigation, and Madden had her personal attorney respond on her behalf. Soon thereafter, Madden attended a demonstration where she ran into Gorton. While initially polite, his tone soon turned menacing as he made it clear his goal was to intimidate and harass Madden. Gorton stated to Madden that she will "probably get sued by town employees", that all of her claims were fabricated, that she will again get banned from the Shelter and that she is making the Shelter a dangerous place to work. Gorton also

13

revealed that the results of his investigation were already pre-determined and that Madden was the problem, not Pastore. This was reminiscent of the towns internal investigation results in 2009 just prior to banning Madden.

40. Gorton then informed Madden that he was "watching" her social media accounts and that he needed to interview her. When Madden responded that she wanted her attorney present for the interview, Gorton became annoyed, threatening and hostile and stated "she (the attorney) will not be there." Madden was left visibly shaken by the exchange, all of which was witnessed by activist Richard Watkins of "Open Nassau" as well as others.

41. At the next Town Board meeting, Gorton appeared and again tried to intimidate Madden by sitting behind her and by making threatening gestures. It was also around this time when Madden learned that Pastore and Gorton were approaching various Shelter employees including Stormo, showing them pictures, and making threats against them if they spoke to Madden.

42. Increasingly afraid for her own safety, Madden shortly thereafter spoke out at the next Town Board meeting. After this meeting, Gorton disappeared. However at this point Madden became aware that Santino had revived the practice of placing politically connected appointees to work at the Shelter. Realizing that Santino had never intended to help her and that the meetings were actually resulting in actions being taken against individuals about whom Madden favorably spoke, Madden declined any further meetings with Santino as his intentions were clear.

43. In September of 2016, Madden received a disturbing Facebook message from a woman named "Lisa Marie." She informed Madden that two police detectives came to her house asking about Madden and posts on her Facebook page, claiming that Madden was

14

under investigation. This eerily reflected the events Madden suffered through years ago with her prior lawsuit. Madden was shocked and frightened by this revelation. Around the same time, Madden received a call from William Mueller accusing her of inciting violence at the Shelter and requesting that she post a statement saying that she "did not want anyone killed." Upon information and belief, this entire chain of events stemmed from a comment a person posted on Madden's Facebook page regarding Pastore and not anything Madden had said.

44. On October 2, 2016, a Facebook page entitled "Truth about Hempstead Animal Shelter Unlimited" was anonymously founded. The "Hempstead Animal Shelter Unlimited" is the name of Madden's nonprofit group and the primary focus of this new Facebook page appeared to be to smear Madden , her non-profit group and her reputation. This group began to publicly attack Madden, calling her "Angry Grandma" and repeating many of the defamatory, false statements that the Town made against Madden which had given rise to Madden's original lawsuit: accusing Madden from profiting from dog deaths, selling dogs to preferred rescue groups, and saying that Madden is responsible for every dog's death in the Shelter. Upon review of the Facebook page, it purportedly holds itself out to be an "official" Town Facebook page listing themselves under "local service, organization, and public services and government."

45. Many of the people who "liked" and commented on this group's posts were those linked to the Shelter and who had harassed Madden such as William Nussbaum. Furthermore, posts attacked Madden personally, even going so far as to post Madden's home address, falsely claiming Madden was killing animals, and directing people as to where to find her. The facebook page quoted Madden's prior lawsuit out of context and used it

15

against her. These posts traumatized Madden, as she has lived through these attacks once before, and the page severely damaged her reputation as a champion for animal rights.

46. Upon information and belief, "Truth about Hempstead Animal Shelter Unlimited" is run by employees of the Town, or their agents.

47. The Defendants' attacks on Madden are ongoing in nature with no signs of relenting.

### *The Damage Caused by the Town's Actions*

48. Due to the attacks on Madden and the defamatory comments made about her, Madden's reputation has been questioned by others, and she has been actively obstructed by the Defendants as she tries to perform her volunteer work.

49. As a result, Madden has suffered great emotional pain and humiliation, depression, anxiety, a loss of sleep, a loss of self-worth, damage to their reputations, and other indices of emotional trauma.

### AS AND FOR A FIRST CAUSE OF ACTION

50. The above stated actions of the Defendants in seeking to chill the Plaintiff Madden as a taxpaying citizen for speaking out on matters of public concern and from access to public facilities is unconstitutional on its face and Defendants have violated the First Amendment of the United States Constitution, and the Equal Protection Clause of the United States Constitution pursuant to 42 U.S.C. § 1983.

51. Plaintiff has no adequate remedy at law.

### AS AND FOR A SECOND CAUSE OF ACTION

52. The above stated actions of the Defendants in attacking the Plaintiff for continuing to perform her volunteer work after she filed and won her previous lawsuit against the Town is retaliatory in nature and Defendants violated the First Amendment of the United States

Constitution, and the Equal Protection Clause of the United States Constitution pursuant to 42 U.S.C. § 1983.

## AS AND FOR A THIRD CAUSE OF ACTION

53. By reason of the foregoing, the Defendant has unlawfully retaliated against the Plaintiff and deprived him of his rights guaranteed by the Constitution of the United States, by depriving him of his liberty and property interests due to his constitutionally protected activities in free assembly as part of a labor union, pursuant to the First Amendment

### DEFENDANT'S LIABILITY

54. The Town has, while acting under color of state law, deprived the Plaintiff of her constitutional rights, as secured by the First and Fourteenth Amendments to the United States Constitution, and all related provisions of the New York State Constitution. The Town is liable for the actions of the individually named Defendants because the Town officials intentionally committed, condoned or were deliberately indifferent to the aforementioned violations of the Rescuers' constitutional rights. Such deliberate indifference may be inferred in the following ways

    a. Defendants' custom or practice of discriminating and/or retaliating against individuals based on their constitutionally-protected forms of speech, expression and association. The discriminatory practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers.

    b. Supervisors failed to properly investigate and address allegations of discrimination, retaliation and/or harassment.

17

    c. Inadequate training/supervision was so likely to result in the discrimination, retaliation, and/or harassment that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision.

    d. Policymakers engaged in and/or tacitly condoned the discrimination/retaliation.

**WHEREFORE**, the Plaintiff demands the Court enter judgment in their favor and against the Defendants as follows:

A. Declaring the Defendants' course of conduct subsequent to the resolution of Plaintiff's initial court case violative of the agreement reached between the parties in that suit;

B. Issuing a permanent injunction mandating that the Defendants allow the Plaintiff to re-enter the Shelter and prohibiting the Defendants from any further actions inhibiting the Plaintiff exercise of her constitutional rights;

C. Directing the Defendants to pay to the Plaintiff all compensatory, equitable, punitive, and liquidated damages to which she may be entitled;

D. Directing the Defendants to pay the Plaintiff attorneys fees should the Plaintiff be the prevailing party to this action;

E. Directing the Defendants to pay the costs and disbursements associated with this action; and,

F. Granting such other and further relief that to the Court seems just and proper.

**Further,** the Plaintiff demands a trial by jury.

Dated: Garden City, New York
      December 12, 2016

Yours, etc.

Jonathan A. Tand, Esq.

JONATHAN A. TAND & ASSOCIATES
990 Stewart Avenue, Suite 225
Garden City, New York 11530
(516) 393-9151

## INDIVIDUAL VERIFICATION

STATE OF NEW YORK )

                       ) ss:

COUNTY OF NASSAU )

Diane Madden, being duly sworn, states that she has reviewed the foregoing Verified Complaint and that the contents of said Verified Complaint are true to her own knowledge, except in matters stated to be alleged upon information and belief, and, as to those matters, she believes them to be true.

Diane Madden

Duly sworn before me

this /2 day of _December_ 2016

NOTARY PUBLIC

HOPE SENZER GABOR
Notary Public, State of New York
No. 01GA4843233
Qualified in Nassau County
Commission Expires August 31, 20/7